[No. 43105.    En Banc.    November 7, 1974.]

THE DEPARTMENT OF ECOLOGY *et al.*, *Respondents*, v. BALLARD ELKS LODGE No. 827, *Appellant.*

*Lycette, Diamond & Sylvester*, by *Robert E. Ratcliffe* and *John T. Petrie*, for appellant.

*Slade Gorton, Attorney General, Charles B. Roe, Jr., Senior Assistant*, and *Robert Jensen, Assistant*, for respondents.

HAMILTON, J.—This action and appeal stem from administrative procedures taken pursuant to the Shoreline Man-

agement Act of 1971, RCW 90.58. Appellant, the Ballard Elks Lodge No. 827, seeks review of a judgment of the Superior Court reversing a decision of the Shorelines Hearings Board which granted to appellant a substantial development permit allowing overwater construction of club facilities on Shilshole Bay in Seattle, Washington.

We reverse the judgment of the Superior Court and reinstate the order of the Shorelines Hearings Board.

In 1963, appellant, a fraternal order with a current membership of approximately 3,500, acquired a parcel of waterfront property situated upon Shilshole Bay. The property is 200 feet in width and is bounded on the east by Seaview Avenue Northwest and extends westerly to the northeast boundary of Salmon Bay Waterway, which connects Shilshole Bay to the Lake Washington Ship Canal. Areawise it contains approximately 157,000 square feet of which 57,000 square feet is tideland totally covered by water at mean high tide. Immediately northwesterly of appellant's property is an 8-story condominium and beyond that the Port of Seattle's Shilshole Marina complex. Adjacent to and southerly from the property there are a boat sales and rental facility and various restaurants and cocktail lounges. The adjacent enterprises both to the north and south are in large part constructed on fills extending out and beyond what would otherwise be the line of mean high tide and to some extent out and beyond appellant's shoreline.

In years past, prior to appellant's acquisition, the property had been utilized as a shipyard. There is evidence that, for the use to which it had been put, it had been land filled seaward to the present line of mean high tide, which line had not been otherwise altered since the mid-1940's or early 1950's. After appellant acquired the property, it was cleared of extant buildings on the uplands, and an old ship grounded on the tidelands was burned and bulldozed.

In 1972, pursuant to RCW 90.58, appellant applied to the City of Seattle for a shorelines management substantial

development permit to construct an over-the-water lodge building which would house such facilities as a restaurant, cocktail lounge, billiard room, gymnasium, lodge room, and similarly oriented accommodations for the membership and their guests. Appellant's first application projected a 38-foot to ultimately 48-foot landward high building constructed entirely on tideland fill westerly of the line of mean high tide, with the upland area being utilized for membership off-street vehicular parking. A second application altered the design of the proposed structure somewhat, reduced the ultimate landward height to 35 feet, provided an easement for public access to the water's edge, moved the building landward some 75 feet, and provided for the structure to be erected on pilings rather than fill, thus permitting the water to flow beneath and to the line of mean high tide.

The City of Seattle granted appellant a substantial development permit to erect the building on their property, conditioned, however, that construction not extend beyond the line of mean high tide and that shoreline stabilization be accomplished to minimize alteration thereof. Appellant sought review before the Shorelines Hearings Board pursuant to RCW 90.58.180(1).[1] Review was appropriately cer-

---

[1]"(1) Any person aggrieved by the granting or denying of a permit on shorelines of the state, or rescinding a permit pursuant to RCW 90.58.150 may seek review from the shorelines hearings board by filing a request for the same within thirty days of receipt of the final order. Concurrently with the filing of any request for review with the board as provided in this section pertaining to a final order of a local government, the requestor shall file a copy of his request with the department and the attorney general. If it appears to the department or the attorney general that the requestor has valid reasons to seek review, either the department or the attorney general may certify the request within thirty days after its receipt to the shorelines hearings board following which the board shall then, but not otherwise, review the matter covered by the requestor: *Provided,* That the failure to obtain such certification shall not preclude the requestor from obtaining a review in the superior court under any right to review otherwise available to the requestor. The department and the attorney general may intervene to protect the public interest and insure that the provisions of this chapter are complied with at any time within forty-five days from the date of the filing of said copies by the requestor." RCW 90.58.180(1).

tified, and the State Department of Ecology and Attorney General intervened in support of the permit as issued by the City of Seattle.

The Shorelines Hearings Board scheduled and conducted hearings, received testimony and documentary evidence, viewed the premises, and heard arguments of counsel. Thereafter, the board entered findings of fact, conclusions of law, and an order requiring the City of Seattle to issue a permit to appellant allowing construction of its proposed clubhouse over the water to a line approximately 30 feet easterly or landward of the position of the building proposed in appellant's second application for a substantial development permit.

The board's order was essentially based upon the theory that properties adjacent to and in the vicinity of appellant's property had been filled and developed westerly of appellant's shoreline prior to the adoption of RCW 90.58, and that to confine appellant's construction to "dry land" would be to ignore the realities of the situation and would unduly penalize appellant without serving any substantive public interest.

The Department of Ecology and the Attorney General petitioned the Superior Court for review of the board's order. The City of Seattle did not. The Superior Court reviewed the written record made before the board pursuant to RCW 34.04.130(5) and (6), reversed the board's order, and reinstated the conditional permit authorized by the City of Seattle upon the grounds that the board's order was "clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order." RCW 34.04.130(6)(e). This appeal followed.

The Shorelines Hearings Board is a quasi-judicial body created by RCW 90.58.170,[2] with authority to review the

---

[2] "A shorelines hearings board sitting as a quasi judicial body is hereby established which shall be made up of six members: Three members shall be members of the pollution control hearings board; two members, one appointed by the association of Washington cities and

grant or denial of a shorelines management substantial development permit. Its proceedings are subject to pertinent provisions of the administrative procedure act (RCW 34.04), as is judicial review of its decisions. RCW 90.58.180(3).[3]

■ The "clearly erroneous" test for judicial review of administrative action under RCW 34.04.130(6)(e) applies to both trial and appellate courts. Upon appeal from a superior court's application of the "clearly erroneous" standard, the appellate court applies the same standard directly to the administrative decision. *Farm Supply Distribs., Inc. v. State Util. & Transp. Comm'n*, 83 Wn.2d 446, 518 P.2d 1237 (1974); *Stempel v. Department of Water Resources*, 82 Wn.2d 109, 508 P.2d 166 (1973); *Newbury v. Department of Pub. Assistance*, 80 Wn.2d 13, 491 P.2d 235 (1971); *Ancheta v. Daly*, 77 Wn.2d 255, 461 P.2d 531 (1969); *Willard v. Employment Security Dep't*, 10 Wn. App. 437, 517 P.2d 973 (1974); *Williams v. Young*, 6 Wn. App. 494, 494 P.2d 508 (1972).

■■ To reach a conclusion that a decision or order of an administrative tribunal, such as the Shorelines Hearings Board, is "clearly erroneous" within the purview of RCW 34.04.130(6)(e), the reviewing court must, based upon the record before it, be firmly convinced that a mistake has been committed, even though there be evidence supporting

one appointed by the association of county commissioners, both to serve at the pleasure of the associations; and the state land commissioner or his designee. The chairman of the pollution control hearings board shall be the chairman of the shorelines hearings board. A decision must be agreed to by at least four members of the board to be final. The pollution control hearings board shall provide the shorelines appeals board such administrative and clerical assistance as the latter may require. The members of the shorelines appeals board shall receive the compensation, travel, and subsistence expenses as provided in RCW 43.03.050 and 43.03.060." RCW 90.58.170.

[3]"(3) The review proceedings authorized in subsections (1) and (2) of this section are subject to the provisions of chapter 34.04 RCW pertaining to procedures in contested cases. Judicial review of such proceedings of the shorelines hearings board may be had as provided in chapter 34.04 RCW." RCW 90.58.180(3).

the decision or order. *Ancheta v. Daly, supra.* In the course of judicial review, due deference must be given to the specialized knowledge and expertise of the administrative agency. The reviewing court cannot simply substitute its judgment for that of the agency. *Farm Supply Distribs., Inc. v. State Util. & Transp. Comm'n, supra.*

Our principal task, then, is to review the entire record before us to determine if the Shorelines Hearings Board order is "clearly erroneous" in view of the public policy enunciated in the Shoreline Management Act of 1971, RCW 90.58. If our evaluation of the record firmly convinces us that a mistake has been made, then the Superior Court correctly applied the "clearly erroneous" test. If not, the Superior Court did not.

The keynote policies of RCW 90.58 are well stated in the introductory section of the legislation. The legislature there states:

> [I]t finds that ever increasing pressures of additional uses are being placed on the shorelines *necessitating increased coordination in the management and development of the shorelines of the state.* The legislature further finds that much of the shorelines of the state and the uplands adjacent thereto are in private ownership; that *unrestricted* construction on the privately owned or publicly owned shorelines of the state is not in the best public interest; and therefore, *coordinated planning is necessary* in order to protect the public interest associated with the shorelines of the state *while, at the same time, recognizing and protecting private property rights consistent with the public interest.* There is, therefore, a clear and urgent demand for a planned, rational, and concerted effort, jointly performed by federal, state, and local governments, to prevent the inherent harm in an uncoordinated and piecemeal development of the state's shorelines.
>
> It is the policy of the state to provide for the management of the shorelines of the state *by planning for and fostering all reasonable and appropriate uses.* This policy is designed to insure the development of these shorelines in a manner which, while allowing for limited reduction of rights of the public in the navigable waters, will pro-

mote and enhance the public interest. This policy contemplates protecting against adverse effects. to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life, while protecting generally public rights of navigation and corollary rights incidental thereto.

. . .

Permitted uses in the shorelines of the state shall be designed and conducted in a manner to minimize, insofar as practical, any resultant damage to the ecology and environment of the shoreline area and any interference with the public's use of the water.

RCW 90.58.020. (Italics ours.)

█ From this statement of policy, it can readily be observed that it is within the contemplation of the legislation that there will, of necessity, be some future and additional development along shorelines in the state, including over-the-water construction, and it does not purport to totally prohibit such development. Rather, the enunciated policy stresses the need that such future development be carefully planned, managed, and coordinated in keeping with the public interest. In further recognition of the inevitability of future development, the introductory section states, in nonexclusive terms, those uses are to be preferred

which are consistent with control of pollution and prevention of damage to the natural environment, or are unique to or dependent upon use of the state's shoreline. Alterations of the natural condition of the shorelines of the state, *in those limited instances when authorized,* shall be given priority for single family residences, ports, shoreline recreational uses including *but not limited* to parks, marinas, piers, and other improvements facilitating public access to shorelines of the state, industrial and commercial developments which are particularly dependent on their location on or use of the shorelines of the state *and other development that will provide an opportunity for* substantial numbers of the people to enjoy the shorelines of the state.

RCW 90.58.020. (Italics ours.)

Finally, the guidelines regarding commercial development which have been promulgated by the Department of

Ecology pursuant to RCW 90.58 contemplate future developments akin to the one here involved. WAC 173-16-060, entitled "The Use Activities," contains the following:

This section contains guidelines for the local regulation of use activities proposed for shorelines. Each topic, representing a specific use or group of uses, is broadly defined . . .

. . .

Finally, most of the guidelines are intentionally written in general terms to allow some latitude for local government to expand and elaborate on them as local conditions warrant. . . .

. . .

(4) Commercial development. Commercial developments are those uses which are involved in wholesale and retail trade or business activities. Commercial developments range from small businesses within residences, to high-rise office buildings. Commercial developments are intensive users of space because of extensive floor areas and because of facilities, such as parking, necessary to service them. Guidelines:

(a) Although many commercial developments benefit by a shoreline location, priority should be given to those commercial developments which are particularly dependent on their location and/or use of the shorelines of the state and *other development that will provide an opportunity for substantial numbers of the people to enjoy the shorelines of the state.*

(b) *New commercial developments on shorelines should be encouraged to locate in those areas where current commercial uses exist.*

(c) An assessment should be made of the effect a commercial structure will have on a scenic view significant to a given area or enjoyed by a significant number of people.

(d) Parking facilities should be placed inland away from the immediate water's edge and recreational beaches.

(Italics ours.)

Although appellant's proposed clubhouse is not, strictly speaking, a commercial development since patronage of its restaurant, cocktail lounge, billiard room, gymna-

sium, and swimming pool facilities will be limited to members and their guests, nevertheless all parties agree WAC 173-16-060 (4) presents relevant guidelines.

Given these policies and guidelines, the Shorelines Hearings Board approached its decision concerning the development of appellant's property with a practical eye upon the densely developed portion of shoreline in the immediate vicinity of the subject property. In support of its decision, the board found, and the evidence sustains its findings, that: (1) many of the existing adjacent developments and structures are not water-dependent uses as defined in RCW 90.58; (2) navigation over appellant's tidelands was de minimus; (3) structural interference with view would be minor; (4) appellant's building over the water would not significantly affect public health, wild or aquatic life, shoreline environment, or public use of the water; (5) the proposed construction would provide an opportunity for substantial numbers of people to enjoy the shoreline; and (6) no public or local protest had been registered in opposition to the proposed structure. In addition, the board noted that to restrict appellant's structure to dry land would: (a) significantly and adversely diminish the area available for off-street vehicular parking; (b) preclude usage of a narrow spit of dry land extending seaward along the northern boundary of the property; and (c) inhibit the scenic view of patrons of the proposed clubhouse.

Given the unique factual situation here existing, we are satisfied the Shorelines Hearings Board, acting within the scope of its authority and expertise, appropriately considered the practical realities pertaining to the existing shoreline, the policy of RCW 90.58, and the relevant guidelines in arriving at its decision. We cannot, therefore, find its decision to be "clearly erroneous." The judgment of the Superior Court is accordingly reversed and the findings of fact, conclusions of law, and order of the board are reinstated.

HALE, C.J., and FINLEY, ROSELLINI, HUNTER, STAFFORD, WRIGHT, UTTER, and BRACHTENBACH, JJ., concur.